IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff,

v.

SAMUEL GABRIEL GONZALEZ,

Defendant.

CRIMINAL NO. 05-250 (CCC)

## REPORT AND RECOMMENDATION

### INTRODUCTION

On August 24, 2005, defendant Samuel Gabriel González filed a Motion to Suppress claiming that he was illegally seized in violation of his Fourth Amendment rights to be free from unreasonable searches and seizures inasmuch as the Border Patrol Agents who intervened with him lacked the required suspicion to stop the vehicle driven by him.   (**Docket No. 23**).

On September 9, 2005, the Motion to Suppress was referred by the Court to the undersigned Magistrate Judge for a hearing and report and recommendation.  (**Dockets No. 24 and 26**).

On September 30, 2005, the government filed its reply in opposition alleging defendant's initial stop occurred at the border or its functional equivalent, thus, the Border Patrol Agents who conducted the stop had statutory authority for the stop.  In the alternative, the government argues that the Border Patrol Agents were aware of specific articulable facts, which together with rational inferences, constituted reasonable suspicion that the vehicle driven by defendant had illegal aliens.  (**Docket No. 29**).

USA v. Samuel Gabriel González
Criminal No. 05-250 (CCC)
Report and Recommendation
Page 2

On October 14, 2005, an evidentiary hearing was held wherein the testimonies of Senior Patrol Agent Martin Santiago ("SPA Santiago") and Patrol Agent Onix Rivera ("PA Rivera"), of the Border Patrol at the Ramey Station, were presented by the government.  (**Docket No. 31**).[1]

## FACTUAL BACKGROUND

The testimonies of SPA Santiago and of PA Rivera[2] may be summarized as follows:

### 1.      Testimony of Senior Patrol Agent Martin Santiago.

SPA Santiago has been working for the United States Border Patrol at Ramey Station for the last thirteen (13) years patrolling the area of Rincón, Aguadilla and Arecibo.  SPA Santiago has investigated over one hundred (100) yawl landings in that area over the years. SPA Santiago's training includes attendance to a five (5) months basic training at the Border Patrol Academy and a one (1) year field experience.   The duties of SPA Santiago, as a Border Patrol Agent, are the detection and deterrence of aliens.

---

[1] Attorney Carlos Beck, counsel for material witnesses Alfredo Santana Vargas and Franklin Polanco Rojas in this case, addressed the Court asking for the Court's help either ordering their release and/or deportation as soon as possible, and if their testimony is needed for the trial in this case, that the same be preserved through deposition. The original material witness complaint against these material witnesses was dismissed by the Government and another material witness complaint was filed as 05-400(M).  Both material witnesses are in custody.  Counsel for the government argued it needs the presence of the material witnesses for trial and is hesitant to release them on bail.  The Court advised Attorney Beck to address his concerns through a Motion to Hon. Carmen Consuelo Cerezo, presiding Judge in charge of this case. On October 24, 2005, Attorney Beck filed a Motion for Order of Release of Material Witnesses or Deposition which is pending before the Court.  (Docket No. 30).  We have been advised by the parties that the material witnesses will be deposed the week of November 14, 2005.

[2] In the absence of a warrant, the government carries the burden of proof.  United States v. Matlock, 415 U.S. 94 S.Ct. 988 (1974).  Where a defendant challenges the constitutionality of a warrantless seizure undertaken on the basis of suspicion falling short of probable cause, the government bears the burden of proving that the seizure was sufficiently limited in its nature and duration to satisfy the conditions of a Terry-type investigative stop. See Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319 (1983); United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995); United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993). U.S. v. Acosta-Colón, 157 F.3d 9, 14 (1st Cir. 1998).

On July 5, 2005, SPA Santiago was employed by the Border Patrol with a shift from 4:00 PM to 12:00 AM and his duties that day were to patrol the area of Rincón, Puerto Rico. The Border Patrol at Ramey Station received information that day that a yawl had landed carrying approximately sixty (60) to eighty (80) immigrants in the area of Barrio Puntas in Rincón, near the old Nuclear Power Plant.  This area is remote, with dense vegetation and is not heavily populated.  Barrio Puntas is a preferred site for yawl landings.

In general, once the Border Patrol is advised of a yawl landing, the Agents go to the landing area to determine the direction in which the aliens are moving, with the aid of intelligence, and gather any signs they have left behind.  The aliens normally remain in the landing area for two (2) to three (3) days and then, they are transported to their final destinations.

On July 5, 2005, SPA Santiago arrived to work at 4:00 PM and was informed of a yawl landing that day.  The Border Patrol Office had received a call that day at approximately 10:00 AM but no specific information of the landing time was provided.  SPA Santiago was assigned to work the area of the landing.  SPA Santiago went to the landing area where he worked the brush area and made some arrests of illegal aliens until nightfall.   SPA Santiago opined that, once the night falls, it is more difficult to work the brush area and detect the aliens.  The landing site is rocky and with heavy vegetation.

On July 5, 2005, at around 10:00 PM, SPA Santiago was on duty with PA Rivera and they parked their Border Patrol vehicle at a strategic location in Road 413  in Barrio Puntas,

Rincón, which is ½ mile from the shore. The patrol car was an SUV Chevrolet Tahoe with green markings and overhead emergency lights. SPA Santiago and PA Rivera were wearing their uniforms. There, SPA Santiago was able to detect some traffic of mainly lookouts trying to identify where the Border Patrol Agents were located. Shortly after midnight (July 6, 2005), while SPA Santiago and PA Rivera were observing traffic, a black Mazda pickup with a two (2) passenger cabin drove past the Border Patrol vehicle. Before this vehicle passed by, no cars had passed the Border Patrol vehicle for one (1) hour. Previously that night, SPA Santiago had seen a small vehicle which departed, a couple of people on foot, and one person in a bicycle. The Mazda pickup was moving towards the Border Patrol Agents when it was detected but, as it passed the patrol car, it reduced its speed and then speed away. SPA Santiago found suspicious the driver's conduct of slowing down the pickup and the fact that, when the pick up slowed down to 20/25 miles per hour, neither the driver nor the passengers looked at Border Patrol Agents. At that time, the Border Patrol car was parked under a street light post and was visible although it did not have the emergency lights on. As soon as defendant's pickup passed by the Border Patrol car, the Border Patrol Agents made the determination to conduct a vehicle stop.

SPA Santiago found unusual the following circumstances:

1.     time of the day, to wit, passed midnight when in his experience only vehicles transporting aliens or lookouts move in that area.

2.     The driver and passengers of the pickup looked rigid.

USA v. Samuel Gabriel González
Criminal No. 05-250 (CCC)
Report and Recommendation
Page 5

3. The conduct of the driver of slowing down while passing by the Border Patrol car and then speeding again.

4. The number of persons in the pick up, namely, the driver and two (2) passengers in a two (2) person cabin.

After the Mazda pickup passed the Border Patrol car, the patrol car made a U turn to catch the pickup which was about sixty (60) feet from the Border Patrol vehicle. It took the Border Patrol car about one (1) mile to catch up with the Mazda pickup which was traveling between 40/50 miles per hour. SPA Santiago ran the license plate of the pickup in the system. Then, the pickup was stopped at a vantage point well illuminated in the intersection of Road 413 and Road 115 at the stop sign besides the Municipal Police Station. The Border Patrol car had the emergency overhead lights on at the time of the stop and the pickup stopped immediately and pulled over after making a turn on the corner. The Border Patrol car stopped behind defendant's vehicle. SPA Santiago got off of the Border Patrol car and approached the driver's side of the Mazda pickup. The driver rolled down the window and SPA Santiago identified himself as Border Patrol and asked the name and nationality of the driver. The driver identified himself as Samuel González, Dominican national, and produced a Puerto Rico's driver's license as identification. When SPA Santiago asked his legal status, González indicated he was a resident alien and provided his resident alien card. PA Rivera approached the passenger's side of the pickup and he asked the same questions to the two (2) passengers. The three (3) occupants were then placed under arrest.

During cross-examination, SPA Santiago admitted that yawls make landings in the area from Mayaguez to Aguadilla and all these areas are rocky and vegetated. Therefore, the area of Rincón is not substantially different from other areas in the North of Puerto Rico. Yawl landings are seasonal in the area from Rincón to Isabela and they occur periodically depending on sea conditions. The month of July, when the yawl landing in this case occurred, is a very busy time for yawl landings, occurring at least twice a week.

SPA Santiago testified there are many houses, residences and businesses around the area near the Nuclear Power Plant, where the Border Patrol car was parked around 10:00 PM on July 5, 2005. The residents come and go and they are all typical Puerto Ricans. Thus, it is not unusual to find people with dark skin in that area.

Very few cars passed by the Border Patrol car after surveillance started and defendant's pickup was stopped. One car passed every ten (10) to fifteen (15) minutes. Another vehicle was also stopped that night by the Border Patrol Agents. Other vehicles were not stopped by the Border Patrol Agents because they only had one (1) occupant or were vehicles of known lookouts with only one (1) occupant. Thus, multiple passenger cars were the ones which were suspicious to the Border Patrol Agents. The road where defendant's vehicle was stopped is the only way out of that area.

SPA Santiago indicated defendant's pickup was suspicious for being in that road at that time of the night, and for the driver's behavior in slowing down the car and then speeding away. SPA Santiago was asked whether slowing down the vehicle when passing the Border

Patrol car was suspicious and SPA Santiago answered in the affirmative.  Similarly, SPA Santiago was asked whether speeding the vehicle when passing the Border Patrol car was suspicious and SPA Santiago also answered in the affirmative.  Thus, either slowing down or speeding away, in a small road, raises suspicion in the Border Patrol Agents because any change in rate of speed raises a suspicion as well as any change in the driver's behavior.

SPA Santiago testified the dark skin of the occupants of defendant's pickup was noticed when they passed by the Border Patrol car but that was not a factor they considered in stopping the vehicle.

The three (3) occupants of defendant's pickup were in the cabin which is built for two (2) occupants.  SPA Santiago was able to determine the cabin was of a small pickup, thus made for two (2) and not three (3) occupants, before stopping defendant's pickup.  SPA Santiago indicated a trait of Dominican nationals is their accent but he did not know the occupants' accent before defendant's pickup was stopped.

Exhibit 1 is a map of the area where the stop in this case occurred.  SPA Santiago marked in blue the surveillance point where the Border Patrol car was parked and he marked in red where defendant's pickup was eventually stopped.  Defendant's pickup was moving in the direction from Punta Higuero to Punta Rincón.  SPA Santiago testified you could be on Road 413 and not be coming from the beach.

The Court took judicial notice that July 5, 2005, when the yawl arrived, was a Tuesday.

USA v. Samuel Gabriel González
Criminal No. 05-250 (CCC)
Report and Recommendation
Page 8

## 2.    Testimony of Border Patrol Agent Onix Rivera.

PA Rivera has been working with the Border Patrol for the last ten and a half (10 ½) years.  PA Rivera's training includes attendance to a five (5) months basic training at the Border Patrol Academy.  PA Rivera was stationed in Texas for nine and a half (9 ½) years and was assigned to the Border Patrol Ramey Station in Puerto Rico on December 12, 2004.

On July 5, 2005, PA Rivera was assigned to the Rincón area, along with SPA Santiago, and he was advised that a yawl had landed that day near the Nuclear Power Plant with approximately sixty (60) to eighty (80) aliens on board.  Some apprehensions were made that day by Border Patrol Agents.  PA Rivera would normally discuss with SPA Santiago before stopping a vehicle.  Defendant's pickup was stopped because it had three (3) occupants cramped in the pickup's cabin and for slowing down when passing by the Border Patrol car.  The driver and the two (2) passengers of the pickup were erect, rigid and steering ahead without acknowledging the presence of the Border Patrol Agents.

The information the Border Patrol Agents had before stopping defendant's pickup was the following: report of a yawl landing that day; confirmation of the yawl landing; anonymous telephone calls received that day related to the yawl landing; other apprehensions that day of illegal aliens; and traffic pattern after midnight during the early hours of July 6, 2005, namely, traffic was quite and almost non-existent.

The area where defendant's vehicle was stopped has dense vegetation and is in the center of town next to the Municipal Police. The area is notorious for alien smuggling and there is a lighthouse which makes the area visible at night for aliens smuggling.

The vehicle of the Border Patrol was a Chevrolet Tahoe with white and green lettering of the Border Patrol with emergency overhead lights which were engaged once the Border Patrol car caught up with defendant's pickup. Defendant's vehicle turned right at the intersection and pulled over. PA Rivera approached defendant's pickup at the passenger's side and identified himself as Border Patrol in English. The passengers did not respond when PA Rivera identified himself in English. Then, PA Rivera identified himself as Border Patrol in Spanish and both passengers responded they were from the Dominican Republic. Neither passengers was able to produce valid immigration documents.

During cross-examination, PA Rivera testified that, during the surveillance that night, less than ten (10) vehicles passed by the Border Patrol vehicle but none was stopped. The suspicion of the Border Patrol Agents in defendant's case was based on the totality of the circumstances. The factors which were considered by the Border Patrol Agents before stopping defendant's vehicle were the following: time of night; report of a prior landing that day with sixty (60) to eighty (80) illegal aliens; known area for yawl landings; and the driver and both passengers were rigid and cramped in the cabin of the pickup.

PA Rivera testified the dark skin of the occupants of defendant's pickup was not a factor which was considered in stopping the vehicle.

USA v. Samuel Gabriel González
Criminal No. 05-250 (CCC)
Report and Recommendation
Page 10

## LEGAL DISCUSSION

### I. Statutory Authority for the Stop.

The Government claims two sources of statutory authority for stopping cars without warrants in the border areas. Section 287(a)(1) of the Immigration and Nationality Act, 8 U.S.C. s 1357(a)(1), authorizes any officer or employee of the Immigration and Customs Enforcement Service without a warrant, "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." There is no geographical limitation on this authority.

Section 287(a)(3) of the Act, 8 U.S.C. s 1357(a)(3), authorizes agents, without a warrant, "within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States."

The Government contends that, in the case at bar, defendant's vehicle was stopped at the intersection of Road 413 and Road 115 in Barrio Puntas in Rincón which is approximately 1/8 of a mile from shore and well within the twenty five (25) mile limitation of 8 U.S.C. § 1357(a)(3). Therefore, the Border Patrol Agents had "unequivocal, absolute, statutory authority to stop Defendant's vehicle without a basis of reasonable suspicion, pursuant to 8 U.S.C. § 1357 and INA § 287." (Docket No. 29).

USA v. Samuel Gabriel González
Criminal No. 05-250 (CCC)
Report and Recommendation
Page 11

The Government interprets the statute as granting authority to stop moving vehicles and question the occupants about their citizenship, even when its officers have no reason to believe that the occupants are aliens or that other aliens may be concealed in the vehicle. Thus, the government ignores that "no Act of Congress can authorize a violation of the Constitution." Almeida-Sánchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed. 596 (1973)[3]. Under familiar principles of constitutional adjudication, the statute should be construed, if possible, in a manner consistent with the Fourth Amendment. Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 348, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936); see United States v. Santa María, 15 F.3d 879, 881 (9th Cir. 1994) (it is clear that we must construe statutes to be constitutional, if possible, and that "no Act of Congress can authorize a violation of the Constitution."(quoting from Almeida-Sánchez, 413 U.S. at 266).

The Border Patrol's authorization to apprehend aliens within the border or its proximity addresses the agency's administrative authorization for warrantless search to ease compliance with immigration policy not issues related to Fourth Amendment violation within a criminal

---

[3] In Almeida, service agents found and seized marijuana in an automobile owned and being operated by a Mexican citizen on a U. S. highway 25 air miles north of the Mexican border. The Mexican was in the United States lawfully and the agents had no cause to search that particular automobile. It was stopped at random as part of a surveillance by a roving patrol. The government claimed that the constitutional reasonableness of that search was established by court decisions dealing with administrative inspections and by § 1357(a)(3) of the Immigration and Nationality Act, which provides for warrantless searches of automobiles and other conveyances "within a reasonable distance from any external boundary of the United States." The Court disagreed. With respect to administrative inspection claims, the majority emphasized the "central difference (between the search of) businessmen engaged in . . . federally licensed and regulated businesses (who) accept the burdens and benefits of their trade, (and a person) not engaged in any regulated or licensed business." Id. at 271, 93 S.Ct. at 2538. The Almeida search was not a valid administrative inspection. Turning to the government claim that the search was made reasonable by Congress' exercise of its power to exclude aliens from the country, the Court recognized the reasonableness of a warrantless search "at the border itself, (or) at its functional equivalents" such as an international air terminal in St. Louis. But the random search 25 miles from the border was stricken as not contemplated by the statute and, therefore, unreasonable.

prosecution context.  *See* Wayne R. LaFave, *Search and Seizure*, §10.5(g), n. 207 (Thomson-West 4th Edition, 2004).  Otherwise, 8 U.S.C. §1357 would allow search for aliens indiscriminately anywhere, including the entire coast land area of Puerto Rico, thus exempting *de facto* from its geographical scope the whole island of Puerto Rico, approximately 35 miles by 100 miles, except for some limited patches in the center rural and mountain areas.

Accordingly, we reject the Government's broad interpretation of the above cited statutes and its attempt to justify a roving patrol search under the administrative inspection doctrine because it would violate defendant's Fourth Amendment rights to be free of unreasonable searches and seizures.

In any event, we need not dwell on this issue any more since, as explained herein below, we conclude there was reasonable suspicion for stopping defendant's vehicle.

## II.    Roving Patrol.

The Fourth Amendment protects all persons "against unreasonable searches and seizures." U.S. Const. amend. IV.  Although police detention of a person constitutes a "seizure," the Supreme Court long has recognized that some such detentions are permissible under the Fourth Amendment, even when the officer making the stop has neither a warrant nor probable cause for arrest. *See* Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880 (1968) (approving police officer's stopping of persons when officer could "point to specific and articulable facts" that "reasonably warrant[ed the] intrusion," despite absence of arrest warrant or probable cause for arrest).

USA v. Samuel Gabriel González
Criminal No. 05-250 (CCC)
Report and Recommendation
Page 13

In more recent cases, the Court has extended this basic principle of Terry--originally espoused in the context of an officer stopping persons on foot who appeared to be preparing to commit a crime--to stops of persons in automobiles, *see* Berkemer v. McCarty, 468 U.S. 420, 439- 40, 104 S.Ct. 3138, 3150 (1984), and to investigations of completed, rather than ongoing, criminal activity, *see* United States v. Hensley, 469 U.S. 221, 227-29, 105 S.Ct. 675, 679-80, 83 L.Ed. 2d 604 (1985). *Id*. United States v. Jones, 187 F.3d 210, 216 (1st Cir. 1999).

Border patrol "officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." United States v. Brignoni-Ponce, 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); see *also* United States v. Inocencio, 40 F.3d 716, 722 (5th Cir. 1994) (recognizing that the Brignoni-Ponce test has been expanded to include suspicions as to any suspected criminal activity).

The "balance between the public interest and the individual's right to personal security," Brignoni-Ponce, 422 U.S. at 878, tilts in favor of a standard less than probable cause in brief investigatory stops of persons or vehicles, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity "may be afoot," United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 109 L.Ed. 1581 (1989).  In making reasonable-suspicion determinations, reviewing courts must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and

objective basis" for suspecting legal wrongdoing. *See, e.g.*, United States v. Cortez, 449 U.S. 411, 417-418, 101 S.Ct. 690, 66 L.Ed. 621 (1981). This process allows officers to draw on their own experiences and specialized training to make inferences from and deductions about the cumulative information available. *Id.*, at 418, 101 S.Ct. 690. United States v. Arvizu, 534 U.S. 266, 122 S.Ct. 744, 747, 151 L.Ed. 2d 740 (2002).

"Based upon that whole picture, the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Cortez, 449 U.S. at 417; United States v. Michelletti, 13 F.3d 838, 840 (5th Cir. 1994) ("Reasonable suspicion must be supported by particular and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant an intrusion."); United States v. Antuna, 186 F.Supp.2d 138, 142 (D.Conn. 2002) ("The totality of the circumstances is judged based on what the officer knew before the suspect was detained.") (citing Arvizu, 534 U.S. at 266, 122 S.Ct. 744). "The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.' " Sokolow, 490 U.S. at 7 (quoting Terry, 392 U.S. at 27); Goodson v. City of Corpus Christi, 202 F.3d 730, 736 (5th Cir. 2000). Indeed, the totality of the circumstances should reflect the outcome of a process in which "officers [] draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Arvizu, 534 U.S. at 273; United States v. Nelson, 284 F.3d 472, 474 (3rd Cir. 2002).

USA v. Samuel Gabriel González
Criminal No. 05-250 (CCC)
Report and Recommendation
Page 15

It is well established that Courts consider whether reasonable suspicion exists based on the following factors: 1) proximity of the area to the border; 2) known characteristics of the area; 3) usual traffic patterns on that road; 4) agent's previous experience in detecting illegal activity; 5) information about recent illegal trafficking in aliens or narcotics in the area; 6) particular aspects or characteristics of the vehicle; 7) behavior of the driver; and 8) the number, appearance, and behavior of the passengers. Brignoni-Ponce, 422 U.S. at 8884-85; *see* United States v. Samaguey, 180 F.3d 195, 198 (5th Cir. 1999)(*citing* United States v. Aldaco, 168 F.3d 148, 150 (5th Cir. 1999)). "[R]easonable suspicion is a fact-intensive test[;] each case must be examined from the totality of the circumstances known to the agent, and the agent's experience in evaluating such circumstances." United States v. Villalobos, 161 F.3d 285, 288 (5th Cir. 1998). *Id*.

The Brignoni-Ponce factors must not be analyzed in isolation from each other, but rather as a collective whole. Arvizu, 534 U.S. at 274 ("The court's evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the 'totality of the circumstances' as our cases have understood that phrase ... [because] Terry ... precludes this sort of divide-and-conquer analysis."); United States v. Espinosa-Alvarado, 302 F.3d 304, 307 n. 6 (5th Cir. 2002) ("Arvizu simply clarified the principle that reviewing courts 'must look at the totality of the circumstances of each case' when making reasonable-suspicion determinations, making clear that a 'divide-and-conquer' style analysis is inappropriate."); United States v. Zapata-Ibarra, 212 F.3d 877, 881 (5th Cir. 2000) ("Our analysis is not limited to any one factor;

USA v. Samuel Gabriel González
Criminal No. 05-250 (CCC)
Report and Recommendation
Page 16

rather, reasonable suspicion is a fact-intensive test in which we look at all circumstances together

to 'weigh not [the] individual layers but the laminated total'."); United States v. Myers, 308 F.3d

251, 276 (3rd Cir. 2002) ("In evaluating the totality of the circumstances in a given case, a court

may not consider each fact in isolation.").  "No single fact is determinative" of the outcome of

a reasonable suspicion analysis. United States v. Guerrero-Barajas, 240 F.3d 428, 433 (5th Cir.

2001); Arvizu, 534 U.S. at 266 (holding that it is improper to "categorize[] certain factors ... as

simply out of bounds in deciding whether there was 'reasonable suspicion' for the stop").

We now analyze the "totality of the circumstances" of this case, in light of the above

factors, to determine whether the stop in this case was justified by reasonable suspicion.

Viewing the evidence as a collective whole through the lens of the Border Patrol Agents,

we find the following factors provided the reasonable suspicion necessary to stop defendant's

pickup:

1.   **Defendant's proximity to the border**[4]: Defendant's pickup was stopped at

the intersection of Roads 413 and 115 in Barrio Puntas in Rincón which is less

that ½ mile from the shore.  Defendant's vehicle was coming from the border

area.

---

[4] The first factor, proximity to the border, is a "paramount factor" in determining reasonable suspicion.
Although we do not employ a bright line test with regard to this first factor, "a car traveling more than fifty miles
from the border is usually viewed as being too far from the border to support an inference that it originated its
journey there." United States v. Orozco, 191 F.3d 578, 581 (5th Cir. 1999); United States v. Jones, 149 F.3d 364,
368 (5th Cir. 1998) (same).

2.  **Known characteristics of the area:** Barrio Puntas is a rocky remote area with heavy vegetation and is not heavily populated. Barrio Puntas is a preferred site for yawl landings carrying illegal aliens.[5]

3.  **Usual traffic patterns on that road**: SPA Santiago is familiar with the usual traffic patterns on Road 413 and 115 because he has been patrolling the area as a Border Patrol Agent for the last thirteen (13) years. The traffic pattern after midnight during the early hours of July 6, 2005 was quite and almost non-existent in the area where defendant's pickup was stopped. The time of the day, passed midnight, is a time of the day in which only vehicles transporting aliens or lookouts move in that area within SPA's Santiago's experience.

4.  **Agent's previous experience in detecting illegal activity**: SPA Santiago has been working for the United States Border Patrol Ramey Station for the last thirteen (13) years patrolling the area of Rincón, Aguadilla and Arecibo. SPA Santiago has investigated over one hundred (100) yawl landings in that area over the years. As part of SPA Santiago's training, he attended a five (5) months basic training at the Border Patrol Academy and a one (1) year field experience. Similarly, PA Rivera has been working with the Border Patrol for the last ten and a half (10 ½) years and, as part of PA Rivera's training, he attended a five (5)

---

[5] See United States v. Nichols, 142 F.3d 857 (5th Cir. 1998) ("road's reputation as a smuggling route adds to the reasonableness of the agents' suspicion."); United States v. Guerrero-Barajas, 240 F.3d 428 (5th Cir. 2001) ("a common route and area for alien smuggling" and it was 12:30 am, when lawful vehicles rarely travel in that area).

months basic training at the Border Patrol Academy.  PA Rivera was stationed in Texas for nine and a half (9 ½) years and was assigned to Ramey Station in Puerto Rico on December 12, 2004.  Thus, both SPA Santiago and PA Rivera have wide range experience in the detection and deterrence of aliens.  Moreover, SPA Santiago is very familiar with the area where defendant's pickup was stopped, including familiarity with the traffic patterns and the customs of the area's inhabitants, because he has been assigned to the Ramey Station and patrolling the surrounding area for more than thirteen (13) years.

5. **Information about recent illegal trafficking in aliens in the area**: The Ramey Station received information on July 5, 2005 that a yawl landing had occurred that day in Barrio Puntas carrying approximately sixty (60) to eighty (80) illegal aliens from the Dominican Republic.  SPA Santiago and PA Rivera had knowledge of the yawl landing that day and investigated the landing area making some arrests that day prior to stopping defendant's pickup during the early hours of July 6, 2005.

6. **Particular aspects or characteristics of the vehicle**: Defendant's 1999 Mazda pickup is small and has a cabin for two (2) passengers.  Before stopping defendant's pickup, SPA Santiago was able to determine the cabin was of a small pickup, thus made for two (2) and not three (3) occupants.

USA v. Samuel Gabriel González
Criminal No. 05-250 (CCC)
Report and Recommendation
Page 19

7.   **Behavior of the driver**[6]: The driver was in a rigid posture and did not look at the Border Patrol Agents[7].  The driver's conduct changed inasmuch as the driver slowed down the pickup when passing next to the Border Patrol car (white Chevrolet Tahoe SUV with green lettering and overhead emergency lights identifying it as Border Patrol which was parked underneath a street light post) and then increased the speed.

8.   **Number, appearance, and behavior of the passengers**[8]: There were three (3) occupants in the small cabin of defendant's pickup which is built for two (2) passengers.  The two (2) passengers and the driver were rigid and did not look towards the Border Patrol Agents.

"Undoubtedly, each of these factors alone is susceptible to innocent explanation, and some factors are more probative than others. Taken together, we believe they sufficed to form a particularized and objective basis for ... stopping the vehicle, making the stop reasonable within the meaning of the Fourth Amendment." Arvizu, 534 U.S. at 277-78; United States v.

---

[6] For purposes of determining whether an investigatory stop is justified by reasonable suspicion, a driver's slowing down, stiffening of posture, and failure to acknowledge a sighted law enforcement officer might well be unremarkable in one instance, such as a busy San Francisco highway, while quite unusual in another, such as a remote portion of rural southeastern Arizona. Arvizu, 534 U.S. at 266.

[7] The avoidance of eye contact may or may not be entitled weight; and it is simply one factor to consider in observing overall behavior. Nichols, 142 F.3d at 857, 868 (5th Cir. 1998); Orozco, 191 F.3d at 582.

[8] SPA Santiago testified the dark  skin of the occupants of defendant's pickup was noticed when they passed by the Border Patrol car but that was not a factor they considered in stopping the vehicle. SPA Santiago also indicated a trait of Dominican nationals is their accent but he did not know the occupants' accent before defendant's pickup was stopped.

Fernández-Castillo, 324 F.3d 1114, 1117 (9th Cir. 2003) ("All relevant factors must be considered in the reasonable suspicion calculus--even those factors that, in a different context, might be entirely innocuous.").

Defendant's Motion to Suppress relies in United States v. Mallides, 473 F.2d 859, 862 (9th Cir. 1973).   (Docket No. 23, pp. 7-8).  In Mallides, "[s]ix Mexican-American appearing males were riding in a Chrysler Imperial at dusk, sitting erectly, and none turned to look at the passing patrol car. From these facts, the officers suspected that the occupants were illegal aliens," Id. at 861. The Mallides court held that "[t]ested by any objective standard there is nothing suspicious about six persons riding in a sedan. The conduct does not become suspicious simply because the skins of the occupants are nonwhite or because they sit up straight or because they do not look at a passing police car." We note the articulated facts upon which the officers based the stop in the Mallides case and the ones relied upon in this case are different.  In this case, unlike in the Mallides case, there are many other factors besides "sitting erectly" and "not looking at the Border Patrol car", as explained above, which were considered by the Border Patrol Agents to establish the required reasonable suspicion. Thus, defendant's characterization that the Mallides "factual controversy [is] strikingly similar to the instant case" is unavailing.

Finally, defendant relies on González-Rivera v. INS, 22 F.3d 1441 (9th Cir. 1994) to contend that "where a factor and its opposite can both be used to justify a stop, the court should not give weight to either factor", like for example, the driver's failure to look at the Border Patrol

USA v. Samuel Gabriel González
Criminal No. 05-250 (CCC)
Report and Recommendation
Page 21

car.[9]  At the evidentiary hearing, SPA Santiago was asked whether slowing down the vehicle when passing the Border Patrol car was suspicious and SPA Santiago answered in the affirmative.  Similarly, SPA Santiago was asked whether speeding the vehicle when passing the Border Patrol car was suspicious and SPA Santiago also answered in the affirmative.  Thus, either slowing down or speeding away, in a small road raises suspicion in the Border Patrol Agents because any change in rate of speed raises a suspicion as well as any change in the driver's behavior.   Nonetheless, the Border Patrol Agents' suspicion in this case was based on multiple factors besides defendant's failure to look at the Border Patrol Agents, as explained above.  Thus, even if we disregard the fact that defendant avoided the Border Patrol Agents, the other factors considered by the Border Patrol Agents, coupled with the agent's experience and knowledge at the time, justified the stop in defendant's case.

In view of the foregoing and considering the facts under the totality of the circumstances, we conclude that the Border Patrol Agents had reasonable suspicion to stop defendant's pickup. Accordingly, it is recommended that defendant's Motion to Suppress be DENIED.

## CONCLUSION

Based on the witnesses' testimony at the evidentiary hearing and having assessed their credibility, it is determined that, pursuant to the preponderance of the evidence and considering the totality of the circumstances, the Border Patrol Agents had reasonable suspicion, under

---

[9] See also United States v. Moreno-Chaparro, 180 F.3d 629 (5th Cir. 1998) ("whether a driver looks at an officer . . . should be accorded little weight" as to "conclude otherwise 'would put the officers in a classic "heads I win, tails you lose" position'").

USA v. Samuel Gabriel González
Criminal No. 05-250 (CCC)
Report and Recommendation
Page 22

totality of circumstances, justifying the investigatory stop of defendant's vehicle.  Thus, it is

recommended that defendant's Motion to Suppress be DENIED.

IT IS SO RECOMMENDED.

The parties have ten (10) days to file any objections to this report and recommendation.

Failure to file same within the specified time waives the right to appeal this order.  Henley

Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994); United States v. Valencia, 792

F.2d 4 (1st Cir. 1986).  See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d

985, 991 (1st Cir. 1988) ("Systemic efficiencies would be frustrated and the magistrate's role

reduced to that a mere dress rehearser if a party were allowed to feint and weave at the initial

hearing, and save its knockout punch for the second round").

In San Juan, Puerto Rico, this 1st day of November of 2005.


**s/CAMILLE L. VELEZ-RIVE**
**CAMILLE L. VELEZ-RIVE**
**UNITED STATES MAGISTRATE JUDGE**